# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **ERIC BERG**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11 C 7939 |
| | ) |
| **NEW YORK LIFE INSURANCE COMPANY** | ) |
| and **UNUM LIFE INSURANCE COMPANY** | ) |
| **OF AMERICA**, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Eric Berg ("Berg") brings this breach of contract action against New York Life Insurance Company ("New York Life") and Unum Life Insurance Company of America ("Unum") (New York Life and Unum are collectively "Insurers"), alleging that Insurers have refused to pay the full disability benefits due under the contractual terms of two insurance policies ("Policies") that Berg purchased from New York Life. Although Insurers provided Berg with total disability benefits between (1) the February 2010 date when he started to see a doctor for his disability and requested Policy benefits and (2) the September 2010 date on which he started work as a financial advisor, Berg contends both that he is entitled to benefits dating back to the 2007 date when he left his job as a pit broker at the Chicago Mercantile Exchange in 2007 and that he continues to be entitled to such benefits even after starting his new job.

Berg has filed the current motion to narrow the issues pursuant to Fed. R. Civ. P. ("Rule") 16, seeking rulings (1) that the Policies do not require that Berg be under the care of a doctor as of his alleged disability onset date, so long as he was under a doctor's care as of the date he applied for disability benefits, (2) that Berg's occupation at the onset of his disability was that of

a pit broker rather than that of an unemployed person (as Unum has asserted) and (3) that Berg's entitlement to benefits dates back to when he ceased working at the Chicago Mercantile Exchange in September 2007. With those issues having been teed up for decision by the parties' submissions,[1] this opinion turns to the task.[2]

### Rule 16 Issue-Narrowing Standard

Resolution of issues as a matter of law, although neither expressly provided for under Rule 16 nor an appropriate subject for a motion for partial summary judgment under Rule 56, can play the role of a useful adjunct toward facilitating the disposition of a case. And if such an undertaking is initiated, it makes sense to apply familiar Rule 56 principles to frame the legal analysis.

Those principles impose on the movant the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving such motions (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of

---

[1] Even though Berg has since sought and obtained leave to file a Second Amended Complaint, his current motion was filed and fully briefed when the First Amended Complaint was still in place. That being so, only three facets of the later pleading will be referred to in this opinion, and the term "Complaint" will refer solely to the First Amended Complaint.

[2] Abbreviations "B." for "Berg," "N." for "New York Life," "U." for "Unum" and "I." for "Insurers" when referring to New York Life and Unum collectively are used in citations throughout this opinion. Berg's Complaint is cited simply "¶ --," and Insurers' Answer to the Complaint is cited "Ans. ¶ --," though parallel citations to Insurers' Answer are omitted where a Complaint allegation is admitted. Both sides' memoranda are cited "Mem.," and all 20 exhibits to Berg's Mem. are simply cited "Ex."

evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)).

**Factual Background**

Berg was self-employed as a commodity pit broker at the Chicago Mercantile Exchange until September 2007. He purchased the two essentially identical Policies (Exs. 1 and 2) from New York Life in 1991 and 1994 respectively. Each Policy is now administered by Unum[3] and entitles Berg to fixed monthly disability income benefits if he is totally disabled, or to a prorated amount if he has a less than total (or "residual") disability. Both total and residual disability are defined by the Policies:

> **Total Disability** means that the Insured cannot do the substantial and material duties of his or her regular job. The cause of total disability must be an injury or a sickness.
>
> \*   \*   \*
>
> **Residual Disability** . . . means that due to an injury or a sickness as defined in this policy, the Insured:
>
> > (a)   is not able to do one or more of the substantial and material duties of his or her regular job; or
> >
> > (b)   directly and apart from any other cause, has a loss of income as defined in this rider of at least 20%.

"Injury and Sickness" as well as "Regular Job" are also Policy-defined:

> **Injury and Sickness**: Injury means an accidental bodily injury of the Insured. Sickness means an illness or disease of the Insured. Except as stated in the Pre-Existing Condition Limitations provision, the injury must occur; or the

---

[3] Insurers dispute that Unum "administered" the Policies (see Ans. ¶ 4) despite the fact that it is undisputed that Berg filed his claim with Unum and has dealt with it through every step of his claim process. More on this subject later.

- 3 -

sickness must first manifest itself, while this policy is in force. The injury or sickness must not be self-inflicted on purpose. The injury or sickness must be one which requires and receives the regular care of a Physician.

\* \* \*

**Regular Job**: The occupation, or occupations if more than one, in which the Insured is engaged when a disability starts.

Berg ceased working as a pit broker at the Chicago Mercantile Exchange permanently in September 2007.[4] He claims that he quit because he could no longer write legibly or quickly (essential parts of a pit broker's job) due to uncontrollable hand shaking and tremors (¶ 8), symptoms that he noticed as early as 2002 (Ex. 6). Berg would later explain in a letter to Unum that he did not seek treatment until 2010 because (id.):

> I had hoped that taking some time off as well as limiting my caffeine intake would eliminate the shaking and allow me to return to work. . . . In the beginning I thought it was more mental than medical and for that reason I never went to the doctor.

While there is no medical evidence of Berg's disability before February 2010, affidavits by his dentist and one of his work colleagues attest that his tremor and writing difficulties existed before he quit his job as a pit broker (Ex. 11). After leaving his job at the Chicago Mercantile Exchange, Berg continued to trade electronically through his account at TD Ameritrade.[5]

---

[4] September 2008 is the date alleged in ¶ 11 (which Insurers deny). Berg's initial Disability Claim Form (later cited as an error), earlier discovery documents submitted by Berg and Insurers' answer to Berg's Motion all refer to September 2007 as the alleged onset date of disability. Insurers cite that as evidence of Berg taking inconsistent positions and an effort to manipulate the determination of his regular occupation. Because the year is ultimately irrelevant as applied to the Policies' provisions, September 2007 will be used for the sake of clarity.

[5] Berg never met the minimum equity balance required of electronic day traders, so Unum did not consider that work in assessing his pre-disability occupation (Ex. 13).

Berg eventually sought examination and treatment by his primary care physician on February 3, 2010, then later saw a neurologist who diagnosed him with an "essential tremor" (Exs. 4 and 5). Berg then submitted a disability claim to New York Life requesting total disability benefits starting from the September 2007 date that he had stopped working as a pit broker (Ex. 3). Insurers approved Berg's claim for total disability benefits under a reservation of rights but paid benefits based on a disability onset date of February 3, 2010, the date on which Berg had first sought medical treatment for his condition (Ex. 8). Shortly thereafter Unum had Berg undergo an independent medical examination that (1) confirmed a diagnosis of "an essential tremor of the upper limbs, which is increased with anxiety and stress" and (2) stated that Berg's "handwriting was distorted and unreadable" and "limits his ability to do his job" (Ex. 9). Unum concluded that the "restrictions and limitations due to [Berg's] tremors and dystonia would preclude [him] from being able to work in an occupation that would require [him] to take orders and quickly write" (Ex. 10).

On September 28, 2010, after several months of receiving total disability benefits from Insurers, Berg began working as a financial advisor for Merrill Lynch (Ex. 12).[6] Upon learning that Berg had a new job, Unum terminated his total disability benefits as of April 4, 2011 and began to pay him residual disability benefits instead (Ex. 10).[7] Unum explained its position to Berg in an April 25, 2011 letter (id.):

---

[6] Berg was terminated from Merrill Lynch on July 27, 2012 (Ex. 14) and began working as a financial advisor at The Guardian Life Insurance Company of America on November 19, 2012 (Ex. 15).

[7] Unum did not pay any residual disability benefits at all to Berg for April 2011, and Berg contends that he should have received benefits for that month. But that dispute is beyond the scope of this Rule 16 motion.

> Your date of disability is February 3, 2010. Your occupation at this time was that of an unemployed person in which case we review your ability to work in gainful occupation based on education, training and experience. Since your current role as a financial advisor falls under this category, you are not eligible for Total Disability benefits. However, since you have a supported medical condition it appears you may be eligible for Residual Disability Benefits.

On September 16, 2011 Berg submitted a pre-litigation appeal disputing Unum's use of February 3, 2010 as the disability onset date. Unum reaffirmed its use of the February date, dubbing Berg's explanation for the delay in filing his claim for benefits and in seeking medical attention as "not reasonable" (Ex. 17). Berg then filed this action, seeking the total disability benefits assertedly due since he left his job in 2007 or, in the alternative, residual disability benefits based on his pre-disability income as a pit broker. Berg's current Rule 16 motion asks for rulings (1) that the Policies do not require that he be under the care of a doctor as of his alleged disability onset date, so long as he was under a doctor's care as of the date he applied for disability benefits, (2) that his occupation at the onset of his disability was that of a pit broker rather than that of an unemployed person as Unum has it and (3) that his entitlement to benefits dates back to when he ceased working as a pit broker in September 2007.

## Berg's Claims Against Unum

First, however, this opinion must deal with Insurers' threshold contention that Berg has not stated a claim against Unum because Unum is not a party to the Policies -- the contracts between Berg and New York Life.[8] But as <u>Kaplan v. Shure Bros., Inc.</u>, 266 F.3d 598, 602 (7th Cir. 2001) (internal citations to controlling Illinois state precedents omitted and emphasis added) explains:

---

[8] Insurers also originally asserted at I. Mem. 3 that Berg stated a claim for only one of the two Policies, but that contention is moot because Berg has since included the second policy in his Second Amended Complaint.

<u>Under Illinois law, a cause of action based on a contract may be brought only</u> by a party to that contract, by someone in privity with such a party, or <u>by an intended third-party beneficiary of the contract</u>.

It cannot be gainsaid that Unum administered the Policies through every step of Berg's claims process. Although Insurers dispute the characterization of Unum's conduct as "administration" (see Ans. ¶ 4 to the Second Amended Complaint), that is not a term of art that is part of the Policies' definitional assembly. It is (quite sensibly) employed here in the everyday sense of the word -- indeed, Unum's own March 3, 2010 letter to Berg (Second Amended Complaint Ex. 3), in "provid[ing] a brief explanation of what is involved in the initial processing of a claim" and thereafter, expressly speaks in terms of "As we administer your claim." And that letter is on Unum letterhead and is signed by the designated representative of "the Paul Revere Life Insurance Company as administrator for New York Life Insurance Company."[9]

Remember that Berg brought this action because he did not receive benefits to which he claims to be entitled under the Policies, benefits that Unum was directly responsible for determining and distributing under its arrangement with New York Life. Neither New York Life nor Unum can quarrel in good faith with the fact that their contractual arrangement made Unum responsible for fulfilling New York Life's obligations to Berg under the Policies and thereby made Berg the intended third-party beneficiary of that contract. Because Berg is indeed the

---

[9] Insurers' groundless nitpicking in this respect is precisely the kind of contention (1) that leads to such decisions as the later-cited A<u>madeo</u> case (290 F.3d at 1161-62), which ascribed bad faith to a comparable legal position advanced by the insurance company in that case and, relatedly, (2) that has made insurance companies the potential targets of such legislation as 215 ILCS 5/155 (to say nothing of what this Court, as an observer, has detected to be a judicial proclivity toward applying contra proferentem principles most broadly in insurance cases). It might reasonably have been expected that responsible counsel for responsible insurers would seek to dissuade their clients from such tactics, but it regrettably seems more likely that some lawyers serve as willing handmaidens to such bootless efforts.

third-party beneficiary of that agreement, the alleged nonperformance of which is the subject of this lawsuit, he is plainly entitled to join Unum as a defendant. Both Insurers will therefore be bound by this memorandum opinion and order.

**Medical Treatment as a Requirement for Total Disability Coverage**

Berg is totally disabled within the meaning of the Policies only if he is unable to perform the material duties of his job due to "an injury or a sickness." To qualify as an injury or sickness within the meaning of the Policies, Berg's condition must "require and receive" care from a physician. Insurers contend that this "causation language establishes physician's care as a condition precedent to Total Disability" (I. Mem. 2), so that because Berg was not treated for his condition until February 3, 2010 that is the earliest date for which he can assertedly claim total disability benefits.

Berg responds that the Policies, fairly read, require only that he be under a physician's care at the time that he filed his claim, so that he need not have been receiving treatment at the time he became disabled. Berg further argues that the Policies' regular care provision is at least ambiguous, an ambiguity that compels this Court to interpret the Policies in his favor under Illinois law as articulated (for example) in Norem v. Lincoln Benefit Life Co., 737 F.3d 1145, 1149 (7th Cir. 2013) (internal citations omitted):

> Policy provisions that are reasonably susceptible to more than one meaning are considered ambiguous. Ambiguous provisions in the policy, especially those that exclude or limit coverage, will be construed against the insurer. However, a provision is not rendered ambiguous simply because the parties disagree over its meaning.

Here the Policies' "requires and receives" provision (part of the "Injury and Sickness" definition) means not only that the claimant's condition must be serious enough to necessitate medical treatment but also that the claimant must actually seek out and receive care for that

- 8 -

condition for it to qualify as a disabling "injury or sickness."[10] To be sure, in some cases injured claimants will be unable -- for reasons that are really beyond their control -- to seek treatment for a significant period of time following the onset of their disabilities, and perhaps the Policies could be construed in such situations to encompass such claimants from the date of their injuries rather than from the later date when they finally receive care. But where as here a claimant chooses not to seek treatment for a disabling condition after a reasonable opportunity to do so -- as contrasted with claimants prevented from seeking treatment by factors beyond their control -- the condition surely should not be considered one that "requires and receives" treatment within the meaning of the Policies' provision.

Because Berg voluntarily waited to seek treatment for his condition for years after he began exhibiting symptoms -- and years more after he purportedly left his job because of those symptoms -- his condition cannot be considered to have required and received care until he actually sought treatment. Consequently his condition did not qualify as an "injury or sickness" triggering his total disability under the Policies until February 3, 2010.[11]

Berg also seeks to backdate his disability onset date to September 2007 by relying on the Benefits Center Claims Manual ("Claims Manual") produced by Insurers during discovery

---

[10] What is said in the text neither states nor implies any view as to the reasonableness of that provision's use of the timing of treatment as a means for calculating the onset date of a serious medical condition.

[11] Berg attempts to refute that analysis by relying on Judge Gettleman's opinion in Newman v. Unum Life Ins. Co. of Am., 2000 U.S. Dist. Lexis 16644 (N.D. Il. Oct. 24, 2000) and on Radford Trust v. First Unum Life Ins. Co. of Am., 321 F. Supp. 2d 226, 245-46 (D. Mass. 2004), both of which are district court cases and are therefore not binding on this Court. Not for that purely procedural reason, but far more importantly in substantive terms, the definitional provisions in the Policies are so patently different from those in the policies at issue in those cases that no further space need be given them.

(B. Mem. 14). Insurers respond that the Policies are the contracts that govern the outcome of this dispute and that the Claims Manual provisions are nowhere referred to or incorporated into the Policies. But even if the Claims Manual were to be looked to as an aid to construction of the Policies, it allows for the backdating of disability onset dates before the first day of medical treatment only if "there is a well documented reason" for the delay in treatment (Ex. 20). Berg's own explanation to Insurers in 2010 totally fails to provide any such "well documented reason" for his 2-1/2 year delay in seeking treatment after leaving his position as a pit broker.

In summary, Berg's failure to seek medical treatment until February 3, 2010 also prevents him from qualifying for the Policies' definition of total disability before that date because only conditions that actually <u>receive</u> care can trigger a finding of total disability. Berg cannot avail himself of any potential ambiguity in that provision because no reasonable interpretation of the Policies will excuse his years-long delay in meeting the treatment requirement.

## Berg's Occupation

Berg also seeks a ruling that Insurers should calculate his benefits under the Policies based on his "regular job" as a pit broker (B. Mem. 12-13) rather than as an "unemployed person" as Unum states in its April 2001 letter to him. As the earlier-quoted language from the Policies states, "regular job" is unsurprisingly defined as the occupation "in which the Insured is engaged when a disability starts." Insurers just as unsurprisingly urge that because Berg quit his job as a pit broker years before he met the Policies' definition for total disability in February 2010, he cannot claim that pit broker was still his "regular job."

That literal reading, based on the present tense of "is engaged" in the Policy definition, ignores the common sense understanding that the occupations in which individuals are engaged are not necessarily determined by a mere snapshot of their jobs (or unemployment) on the day

that their disabilities begin (Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1162-63 (9th Cir. 2002)). Journalists do not stop being journalists the moment they quit or are fired by one publication, only to resume that occupation when hired by another.[12]

In the same way, Berg's regular job did not automatically cease to be pit broker the instant that he quit the Chicago Mercantile Exchange. If he had decided to take another job as a pit broker not long after that, his occupation throughout that interim period -- and thus his "regular job" as defined by the Policies -- would still have been as a pit broker. And the same analysis arguably applies if, as Berg alleges, he quit due to a disability that prevented him from fulfilling his duties, while still harboring the hope that he could recover and return. In that respect even his day trading and the fact that he later began work as a financial analyst would not necessarily prevent Berg from retaining his status as a pit broker. As Winter v. Minn. Mut. Life Ins. Co., 199 F.3d 399, 411 (7th Cir. 1999) -- by sheer chance a case that involved a disability claimant's having left his occupation as a pit trader due to a disability -- has put it:

> If a party is merely on a leave of absence from his regular occupation, and working in a side occupation, when he is injured, his regular occupation, not the side occupation, is the relevant occupation for the purpose of benefits.

But that is not the scenario posed by this case. Here Berg left his pit broker position years before his disability onset date in February 2010, and in that time he sold his seat at the Chicago Mercantile Exchange (I. Mem. 9). Any notion that pit broker remained his "regular job" at the onset of his total disability gives no weight at all to the word "regular" and to its normal common-sense connotation of regularity.

---

[12] "Springing uses" may have their place in the jurisprudence of wills and trust or in the law of future interests in real property, but the concept has no place in the present context.

**Conclusion**

Berg's motion is granted only to the limited extent that Unum is preserved as a codefendant in this action. In all other respects the motion is denied for the reasons stated in this opinion. Finally, 9:15 a.m. at August 20, 2014 is set as the next hearing date to discuss the next steps in this litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 12, 2014